# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PETER RUBENS** | **CIVIL ACTION** |
| **VERSUS** | **NO.  14-0789** |
| **BURL CAIN, WARDEN** | **SECTION "R" (1)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the petition, this Court has determined that a federal evidentiary hearing is unnecessary at this time. See 28 U.S.C. § 2254(e)(2).[1] For the following reasons, I recommend that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

## I.    STATE COURT PROCEDURAL BACKGROUND

The petitioner, Peter Rubens, is incarcerated in Louisiana State Penitentiary in Angola, Louisiana.[2] On October 9, 2008, Rubens was indicted in  Orleans Parish for second degree

---

[1] Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

[2] Rec. Doc. No. 1.

murder.[3]  Rubens was tried before a jury on August 18 - 21 and August 24, 2009, and was found guilty as charged.[4]  At a hearing held on August 31, 2009, the state trial court denied Rubens' motion for a new trial and sentenced him to life imprisonment without the possibility of parole.[5]

On direct appeal, Rubens' appointed counsel, John Harvey Craft, raised six issues before the Louisiana Fourth Circuit: (1) sufficiency of the evidence; (2) erroneous denial of Rubens' motion for new trial without conducting an evidentiary hearing; (3) witness intimidation; (4) erroneous admission of other bad acts; (5) improperly forcing Rubens to attend all bench conferences, despite his request to the contrary; and (6) unconstitutionality of the non-unanimous jury instruction.[6]

On November 16, 2010, Rubens filed a supplemental brief with the Louisiana Fourth Circuit in which he raised fifteen claims: (1) sufficiency of the evidence; (2) prosecutorial misconduct; (3) denial of the right to present a defense; (4) failure by the State to turn over exculpatory evidence; (5) denial of compulsory process to "evidence of overt acts;" (6) denial of the right to cross-examination; (7) deliberate failure by the judge to correct perjured testimony; (8) erroneous admission of hearsay; (9) erroneous admission of other bad acts; (10) failure by the trial court to rule on a motion for return of property; (11) failure by the trial court to sequester witnesses; (12) failure to transcribe bench conferences; (13) prosecutorial and judicial misconduct resulting in an unfair trial[7]; (14) assessment of fines and fees in violation of due process of law; and (15)

---

[3] St. Rec. Vol. 1 of 8, Bill of Information, 10/9/08.
[4] St. Rec. Vol 1 of 8, Trial Minutes, 8/18/09 – 8/21/09 & 8/24/09.
[5] St. Rec. Vol 1 of 8, Sentencing Minutes, 8/31/09.
[6] St. Rec. Vol. 5 of 8, Appeal Brief, 2010-KA-1114, 9/13/10.
[7] Although Rubens titled this claim as ineffective assistance of counsel, the claim itself had nothing to do with the performance of trial counsel, as discussed in this Court's previous report and recommendation.  St. Rec. Vol. 5 of 8, Supplemental Appeal Brief, 2010-KA-1114, 11/13/10.

failure by the trial court to admit character evidence of the decedent.[8]  On November 30, 2011, the Louisiana Fourth Circuit affirmed Rubens' conviction in a split decision.[9]

Rubens filed two writ applications to the Louisiana Supreme Court.  On February 13, 2012, Rubens' appointed counsel, Christopher Aberle, filed a writ application raising two issues: (1) the trial court abused its discretion by refusing defense counsel the opportunity to proffer evidence that the prosecution intimidated a defense witness; and (2) the Louisiana Fourth Circuit erred by ruling on the merits of an ineffective assistance of counsel claim because Rubens never raised ineffective assistance of counsel.[10]  The Louisiana Supreme Court denied the writ without explanation on May 25, 2012.[11]

Subsequent to Mr. Aberle's writ, Rubens filed a pro se writ to the Louisiana Supreme Court on February 16, 2012.[12]  In his pro se writ, Rubens raised seven claims: (1) sufficiency of the evidence; (2) denial of the right to present a defense through government intimidation of defense witnesses; (3) deliberate failure by the State and trial court to correct false testimony; (4) prosecutorial misconduct during opening and closing statements; (5) denial of compulsory process to subpoena phone records; (6) denial of the right to cross-examination; (7) repeated misconduct by the State and trial court resulting in an unfair trial;[13] (8) failure by the State to turn over exculpatory evidence; (9) prosecutorial misconduct through vouching for witness' credibility;[14]

---

[8] Id.
[9] State v. Rubens, 83 So. 3d 30 (La. Ct. App. 2011).
[10] St. Rec. Vol. 6 of 8.
[11] Id.; State v. Rubens, 90 So. 3d 410 (La. 5/25/12).
[12] St. Rec. Vol. 7 of 8, Application for Writ of Certiorari, 2012-KA-399, 2/16/12.
[13] Although Rubens framed this claim as ineffective assistance of counsel, the substance of the claim, as previously discussed in this Court's initial report and recommendation, had nothing to do with the performance of trial counsel.  Id.
[14] Application for Writ of Certiorari, 2012-KA-399, 2/16/12, p. 10, claim No. 3; St. Rec. Vol. 7 of 8.

and (10) unconstitutionality of the Louisiana aggressor doctrine.[15] On October 12, 2012, the Louisiana Supreme Court denied Rubens' pro se writ application without explanation.[16]

On March 18, 2013, the United States Supreme Court denied Rubens' writ of certiorari and his conviction became final that same day.[17] Geisberg v. Cockrell, 288 F.3d 268, 271 (5th Cir. 2002) (for purposes of the AEDPA, a state conviction becomes final when a petition for certiorari is denied by the United States Supreme Court), cert. denied, 537 U.S. 1072 (2002); Crutcher v. Cockrell, 301 F.3d 656 (5th Cir. 2002); State v. Hofman, 768 So.2d 592, 592 (La.2000) (conviction not final until application for writ of certiorari to U.S. Supreme Court is denied), cert. denied, 531 U.S. 946 (2000); see also, Burton v. Stewart, 549 U.S. 147 (2007) (in a criminal case, judgment includes conviction and sentence, therefore the AEDPA "limitations period did not begin until both his conviction and sentence 'became final by the conclusion of direct review or the expiration of the time for seeking such review,'" citing 28 U.S.C. § 2244(d)(1)(A)).

II.    FACTUAL BACKGROUND

The Petitioner, Peter Richard Rubens, was a longtime resident of New Orleans who had worked as an artist and painter.[18] After Hurricane Katrina, the defendant went into the construction business, repairing residences and structures that had been damaged by the storm. The victim, Robert Irwin, who was also known as "Bobby" or "B", had worked for the defendant in various construction capacities including a laborer, carpenter and foreman.  Prior to the date of the victim's death on June 29, 2008, the defendant was living at 5036 South Prieur Street, a house that was

---

[15] Application for Writ of Certiorari, 2012-KA-399, 2/16/12.
[16] State ex rel. Rubens v. State, 99 So. 3d 37 (La. 10/12/12).
[17] Rubens v. Louisiana, 133 S. Ct. 1595 (2013).
[18] The facts are taken from the Louisiana First Circuit's opinion on direct appeal.  Rubens, 83 So. 3d at 35-37.

owned by Ray Manning. Rubens was living there along with his girlfriend Diane Hoover. The house had been under repair for some months on an arrangement that had been worked out between Rubens and Manning that included Rubens living on the second floor of the residence while the repairs on the house were ongoing. Testimony at the trial revealed the arrangement between Rubens and Manning had soured somewhat, and Rubens had obtained an opportunity to land a lucrative construction job in Iowa. Along with a group of workers, Rubens planned on leaving for Iowa on June 29, 2008.

Further testimony revealed that Robert Irwin was not one of the workers who was to accompany Rubens on the trip to Iowa. Witnesses at trial testified that Irwin had been having an affair with Rubens' girlfriend, Diane Hoover, for some period of time. On Saturday, June 28, 2008, Robert Irwin spent the day in St. Rose with his friends Lynnette and Alan Betts. The Betts had been friends with Irwin for about two years. Irwin was in the process of purchasing the Betts' motorhome which Irwin lived in and was parked in the driveway of the Betts' home in New Orleans that was located across the street from 5036 South Prieur. Also spending Saturday June 28, 2008, with the victim were Jess Salts, son of Lynnette Betts, and Salts' girlfriend and mother of their two small children, Emily Shelton.

On Sunday, June 29, 2008, Jess Salts drove Robert Irwin from St. Rose back to New Orleans. Also along for the trip were Emily Shelton and her two children. Over the weekend Irwin had told his friends of his problems with his former boss Peter Rubens. He knew that Rubens and a group of his workers were soon to leave for a job in Iowa, and he wanted to get back home in order to safeguard his tools and to confront Rubens regarding money owed to him. Irwin also told his friends that Diane Hoover was not going to Iowa with Rubens but that she was to stay in New Orleans and build a life with him. Lynnette Betts was concerned for Irwin to confront Rubens

and stated, "He [Bobby] feels like somebody probably could die that night." Jess Salts testified that Irwin told him on the ride from St. Rose to New Orleans, "If he [Rubens] pulls a gun on me, I will shove it up his a--."

Despite these comments, Salts and his girlfriend Shelton both testified that Irwin's demeanor was calm and relaxed when they reached the South Prieur Street address. The door to the home was open, and there were men on the porch and around the home. When Irwin exited the Salts vehicle, he left his bags as well as his dog "Tchoupi" and walked straight into the 5036 S. Prieur Street address. When Salts realized Irwin had left his bags and dog, he walked up to the residence and yelled for his friend "B." Irwin came from inside of the house and told Salts all was fine, then gave him his keys so Salts could put his bags and dog in his motor home across the street. On his way back into the house Irwin joked with the men. Salts walked across the street to put Irwin's bags and dog in his motor home. On the way back to his car, he heard the shots and a scream. Salts walked to the front of the house, where the men were running everywhere. When he reached the front steps of the house, he saw the defendant, Peter Rubens, who appeared on the porch and said to Salts, "You got a problem? I'll put you down like I put 'B' down." Salts did not see a gun, and told the defendant he would not leave until "B" came out. At this point, Salts saw his friend Irwin at the bottom of the front door. As he went to him, he could see that he had been shot, was suffering and moving only slightly. Salts ran out and called 911 when Ray Manning, the owner of 5036 South Prieur, walked up. Salts gave the phone to Manning, who gave the address to the 911 operator. Irwin expired when Salts returned inside.

New Orleans Police Department Homicide Detective Robert Long arrived on the scene approximately one and one-half hours after the shooting. The primary crime scene was in an office located on the second level of 5036 South Prieur Street, the residence of Ray Manning. Four .380

caliber spent shell casings and a spent bullet were recovered in the office. Det. Long's investigation revealed that all the shots were fired in the office.  The secondary crime scene was where the victim was found, on the first level of the residence, just below the stairwell.  There was a blood trail where the victim apparently touched the wall and handrail of the stairwell as he went down the stairs. The victim was lying on his back, face up.  Peter Rubens was developed as a suspect, and an arrest warrant for his arrest for second degree murder was obtained at 11:55 p.m. on the night of the killing.

Det. Long searched for the defendant unsuccessfully.  Later, he and Det. Weyshan returned to the Manning residence around 1:00 a.m. Det. Weyshan noticed that the front porch light that he had left on when they previously left the crime scene was off, and that a light was on in the second floor bedroom which had been turned off when they had left previously.  A police tactical unit was called in and searched the residence.  The defendant was apprehended inside the attic located on the third floor of the residence.

Det. Long advised the defendant of his rights at the scene, and defendant immediately began saying that he had to kill Bobby because Bobby was coming after him with a pencil.  Det. Long asked defendant where the gun was, and defendant said he had dropped it by the body.  He said if he had still had the gun, he would have killed himself.  Defendant was taken back to the homicide office where Det. Long attempted to interview him, but the defendant invoked his right to counsel.  Despite invoking his right to counsel defendant continued to state that he had to kill Bobby because Bobby came after him with a pencil.  Defendant also said something to the effect that "my guys know what's gonna happen to them if, if they don't listen to me," although Det. Long admitted that was not an exact quote.  Det. Long contacted Det. Garcia, who had remained at the

Manning residence, and asked her to conduct another canvas of the office to see if she could locate a pencil out of place.  There was no pencil out of place, and the gun was never found.

III.    FEDERAL HABEAS PETITION

On April 4, 2014, the clerk of court filed Rubens' petition for federal habeas corpus relief in which he listed eight grounds for relief: (1) witness intimidation; (2) ineffective assistance of counsel; (3) failure by the State to correct perjured testimony; (4) prosecutorial misconduct; (5) denial of the right to cross-examination; (6) failure by the State to turn over exculpatory evidence; (7) denial of compulsory process; (8) erroneous admission of hearsay evidence.[19]

In Rubens' attached memorandum of law and argument he itemized sixteen specific claims, all of which were framed, and predominately argued as, ineffective assistance of counsel.[20] Rubens' claims of ineffective assistance of counsel were factually specific and ranged from failure to investigate, failure to impeach, failure to request grand jury transcripts, conflict of interest and loss of evidence.[21]  Despite Rubens' primary focus on ineffective assistance of counsel, he at least tangentially addressed the claims listed in his petition.[22]

On August 6, 2014, the clerk of court filed the State's response to Rubens' petition for habeas corpus arguing that Rubens' claims of ineffective assistance of counsel are unexhausted.[23] On March 9, 2016, Magistrate Judge Shushan, since retired, issued a report and recommendation that Rubens' petition be dismissed without prejudice for failure to exhaust state court remedies.[24] Nineteen days later, on March 28, 2016, Rubens filed an objection to this Court's report and

---

[19] Rec. Doc. No. 1, p. 5, (Petition).
[20] Id.
[21] Id.
[22] Rec. Doc. No. 1, p. 32, 35, 41-47, 50-57, (Memorandum of Law and Argument).
[23] Rec. Doc. No. 16.
[24] Rec. Doc. No. 22.

recommendation and requested a stay and abeyance.[25]  The next day, March 29, 2016, District Court Judge Sarah Vance denied Rubens' motion for a stay but gave him thirty days to amend his initial petition.[26]  In response, Rubens filed an amended petition on April 25, where he abandoned all but seven claims: (1) denial of the right to present a defense; (2) failure by the State to correct perjured testimony; (3) prosecutorial misconduct; (4) denial of the right to cross-examination; (5) failure by the State to turn over exculpatory evidence; (6) erroneous admission of hearsay evidence; and (7) denial compulsory process.[27]

## IV.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable

---

[25] Rec. Doc. No. 23.
[26] Rec. Doc. No. 24.
[27] Rec. Doc. No. 25.  In his Motion to Amend, Rubens claims that because the State failed to respond to several of his claims those claims must be "averred as true".  Rec. Doc. No. 25, p. 2.  Rubens is mistaken. There is no legal basis to automatically deem any part of a petitioner's allegations to be admitted by the respondent. In fact, the law governing § 2254 cases is just the opposite; matters in the respondent's answer "shall be accepted as true" unless there is a traverse or other basis in the record to deem it untrue.  28 U.S.C. § 2254.  There is no mandate that the respondent's failure to address an issue entitles the petitioner to relief.

determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "*was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.*"  28 U.S.C. § 2254(d)(1) (emphasis added).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a

particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; *it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.* AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted) (emphasis added).

Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute*

> *for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted)(emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White, 134 S. Ct. at 1701.

V.    ANALYSIS

1.    Denial of the Right to Present a Defense

In his first claim, Rubens alleges that he was denied his right to present a defense through prosecutorial intimidation of a witness. Specifically, Rubens alleges that assistant district attorney, Mary Glass, called Diane Hoover and told her that she would "testify for the State or be put in jail".[28] Rubens also claims that "Asst. D.A. Matthew Bourque [confronted and threatened Diane Hoover] a number of times in the hallway during the trial" and that the District Attorney, Leon Cannizzaro, also approached her during trial and told her to 'tell the truth'.[29] In the last reasoned state court opinion, the Louisiana Fourth Circuit Court of Appeal denied Rubens' claim, ostensibly

---

[28] Rec. Doc. No. 1, p. 65.
[29] Id. at 66.

12

because the State's "warnings concerning the dangers of perjury [were not] emphasized to the

point where they threaten[ed] and intimidate[d] [Diane Hoover] into refusing to testify".[30]

The Fourth Circuit gave the following factual summary:

> Defense counsel notified the trial court that he had a defense witness under subpoena, Diane Hoover, who, according to testimony in the State's case, had contemporaneous romantic relationships with the defendant and the victim. Defense counsel represented to the trial court that the State had informed Hoover at some point that she had perjured herself in her prior testimony, at a <u>Prieur</u> hearing, and was subject to being prosecuted for perjury.  The following colloquy occurred:

>> MR. HESSLER: But she indicated to me that the State did tell her that she lied in that testimony and that she is subject to being prosecuted for perjury.  I—I clearly believe—

>> MR. BOURQUE: That's not exactly—

>> MR. HESSLER: —as does she—I am just repeating what she said.

>> THE COURT: Sure, okay. And so the issue—

>> MR. HESSLER: And I clearly believe that that's intimidating my witness and putting a chilling effect on her to keep her from—from testifying.

>> THE COURT: Well, has the lady indicated to you, Mr. Hessler that she will not be testifying for you?

>> MR. HESSLER: Well, Your Honor, at this point it's—it's up in the air. I have got a—I have got a witness that's intimidated, clearly intimidated and—and now I have got decisions to make.

>> THE COURT: State, let me hear from you.

>> MR. BOURQUE: Flatly, 100 percent there is no intimidation of Ms. Hoover by myself or anyone else from the State in any way, shape, or form.
>> I approached Ms. Hoover, identified myself, she knows who I am; told her—I asked her if anyone had explained to her the consequences for perjury, lying in a murder case, and that I didn't— I was just made aware this week that the penalties are enhanced,

---

[30] <u>Rubens</u>, 83 So. 3d at 44.

depending on the type of case that you perjure yourself in. In a murder case, it's 5 to 40 years.

And I asked her if she was aware of that. She said, no, nobody has told her anything. I said, "I don't want to see you get wrapped up in this. I don't want you to have to lie, if that's what your intent is, I don't want you to do that." She said that she's not lying.

At some point we did discuss the issue of the <u>Prieur</u> hearing and I suggested that—I never said that I will prosecute you for that. I never said that that's on the table.

I indicated some disbelief as to the validity of the entirety of her statement that she made during the <u>Prieur</u> hearing, but at no point threatened her; at no point told her she would be prosecuted or that she could be prosecuted if something didn't happen.

All I told her was that if she took the stand and lied in this case—

THE COURT: This all sounds—

MR. BOURQUE: —that's perjury.

THE COURT: —familiar to me. Didn't we have this same—

MR. BOURQUE: Yes, ma'am.

THE COURT: —discussion last week?

MR. HESSLER: Right, but I believe it happened again this morning. And, your Honor, I would ask that the Court call her in and question her and see what she says exactly happened. And, you know, there is an allegation made by her that—that she was offered to be paid for her testimony.

Now, all I am saying, Your Honor, is—I am just saying the allegation she told me this morning. But the—the—the position that the D.A. just took was that he "indicated some disbelief." I would ask that you call Ms. Hoover in and ask her what she took away from that conversation, what was said—

THE COURT: Okay, and let me say this, maybe the Court will do that, but at this time I would like to proceed with the trial. It's not—the State is still putting on its case in chief. So, if we can allow that to happen—

MR. HESSLER: Okay, I'll—I'll deal with that.

THE COURT: —and I will call the lady in.

Is this lady a witness of the State's? Possibly, okay.

Let's go start completing the State's case and prior to your case, if the issue still needs to be handled, we will deal with it.

MR. HESSLER: Okay.

The prosecutor represented to the court that he had not interviewed or spoken directly with Hoover until the week of trial, when he saw her in the hallway and spoke to her.

Following the presentation of the State's case in chief, the issue of the alleged intimidation of Diane Hoover was again addressed in chambers. Defense counsel represented that the District Attorney, Leon C. Cannizzaro Jr., had told Hoover that morning, outside of the courtroom, to "[j]ust tell the truth." The State later stipulated that the District Attorney had told Hoover to tell the truth. The representations were that the District Attorney came into the courtroom to observe a portion of the trial proceedings, and at some point, either prior to entering or after leaving the courtroom, he spoke to Diane Hoover in the hallway. Defense counsel represented that Hoover had indicated to him that she felt threatened and intimidated by the District Attorney's comments made that morning and during interviews with her, "and that she does not want to testify and will not testify in the defense case, if called to testify."

The trial court noted that when testifying under oath one is expected to tell the truth, and that it could understand the State briefly stating to a witness, "Just tell the truth." Defense counsel conceded that a brief "[j]ust tell the truth" statement in and of itself did not become anything, but it became more egregious in light of the fact that Hoover was a defense witness; that the State alleged her to have perjured herself once already; that the prosecutor making that allegation had the power to charge her and bring her to trial; and that the District Attorney himself told her in the hallway to "just tell the truth." Defense counsel argued than an average person would feel intimated by those State actions.

Defense counsel, for the second time, requested that Hoover be brought in and questioned, and counsel wanted to make certain the record reflected that she did not want to testify. The trial court then stated that it was not having counsel "go word for word," and asked defense counsel if he intended to call Hoover as a witness, and whether she had been subpoenaed to testify that day. Defense counsel asked the court, for the third time, to bring Hoover in chambers to hear from her, saying again that he did not believe he could put her on as a witness. Defense counsel also represented that Hoover "told me she doesn't really want to testify. She told me she won't testify."

Defense counsel also argued that if called, "she becomes a hostile witness because of the actions by the State." Defense counsel requested, for a fourth time, that the trial court hear from Hoover as to what the prosecutor and the District Attorney had said to her. The trial court stated that defense counsel was asking for

the equivalent of a secondary hearing, and it noted that in fairness, the court would have to bring in the District Attorney and put him under oath. The court stated that the matter was something the court did not even need to entertain.

At that point, defense counsel moved for a mistrial on the grounds that he was effectively being denied a right to present a defense by the tactics of the District Attorney's Office. Defense counsel noted that after meeting with "them," apparently meaning one or more prosecutors, Hoover consulted someone about getting an attorney. In connection with the argument on defendant's motion for mistrial, the trial prosecutor represented to the court that when he had talked to Diane Hoover during the trial and had questioned the truthfulness of her <u>Prieur</u> hearing testimony, Hoover told him that she was not going to lie. The trial court directly asked defense counsel, for the record, if he had intended to call Hoover as a witness. Defense counsel replied in the affirmative.

After the State rested, immediately prior to defendant presenting what turned out to be his sole witness, the trial court advised defense counsel that it could order Hoover to testify, given that she was under subpoena. The court stated that beyond that, it was not going to entertain whether the District Attorney said "A" or "B" to her, and if a prosecutor said "A" or "B" to her. The court felt that the matter had no bearing on the trial proceedings. The trial court wanted Hoover to understand that the information she testified to in the <u>Prieur</u> hearing had already been ruled inadmissible; that this Court had denied the State's writ application as to that ruling; and that she would not be coming to testify on anything that involved the <u>Prieur</u> hearing. The trial court offered to appoint an attorney to counsel Hoover.

Following the testimony of defendant's only witness, the trial court, in chambers, stated that the only thing it was willing to do with regard to Diane Hoover was to order her to testify pursuant to her subpoena. The court advised defense counsel that it had requested that an attorney be called so she could be advised of her rights. The trial court asked defense counsel if he intended to call Hoover as a witness, and he replied that he could not call her under the circumstances. Defense counsel requested, for the fifth time, to have the court question Hoover and also requested to proffer her testimony, albeit with the questioning coming from the court, but the trial court denied those requests.

Here, counsel for defendant was given every opportunity to have Diane Hoover be compelled to testify. The trial court was willing to provide counsel to Diane Hoover if counsel for defendant called her as a witness, but counsel for defendant declined.

<u>Rubens</u>, 83 So. 3d at 41–44.

The United States Supreme Court has made clear that there is a point at which threats of a perjury charge against a defense witness can exert "such duress on the witness' mind as to preclude

him from making a free and voluntary choice whether or not to testify," thereby depriving the accused of his right to due process.  Webb v. Texas, 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972).  The United States Fifth Circuit Court of Appeal elaborated on this right in United States v. Thompson:

> Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. To make a showing that the government has infringed on this right, the defendant must show that the government's conduct interfered substantially with a witness's free and unhampered choice to testify.

130 F.3d 676, 686 (5th Cir. 1997) (citation and quotation marks omitted).

While the State is prohibited from substantially interfering with a witnesses free and unhampered choice whether to testify, courts have been hesitant to intervene when a witness decides not to testify as originally intended after being advised or reminded of the criminal ramifications of committing perjury. See, e.g., United States v. Nunn, 525 F.2d 958, 960 (5th Cir. 1976).  For example, the facts in Webb were particularly egregious, with the trial judge, *sua sponte,* issuing the following personal threat from the bench to the sole defense witness:

> Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. *If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood (sic) is that you would get convicted of perjury* and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

Webb, 409 U.S. at 95–96 (emphasis added).

Further, is it clear that "[i]t is not improper *per se* for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely." United States v. Blackwell, 694 F.2d 1325, 1334 (D.C. Cir. 1982); see also United States v. Simmons, 670 F.2d 365, 371 (D.C. Cir. 1982) ("It is hardly a threat for a prosecutor to advise a potential witness, who is telling two stories with respect to a defendant's criminal involvement, that he might be prosecuted for perjury if he testifies falsely."); United States v. Girod, 646 F.3d 304, 312 (5th Cir. 2011) ("presenting the potential defense witnesses with the facts of the investigation and the crimes charged does not amount to witness intimidation; there must be evidence of threats or intimidation.") (citations omitted); United States v. Ford, No. CA V-09-066, 2012 WL 2120587, at *10 (S.D. Tex. Jan. 24, 2012).  Additionally, the mere fact that a prosecutor may elect to prosecute a witness for perjury does not inevitably constitute a form of witness harassment, in that "[a] prosecutor is always entitled to attempt to avert perjury and to punish criminal conduct." United States v. Viera, 839 F.2d 1113, 1115 (5th Cir. 1988).

This Court finds that Webb is likewise distinguishable from the instant case.  In Webb, the trial judge made it clear that he believed that the defense witness was going to lie if he took the stand and, in that event, the judge would 'personally see to it' that the witness was indicted for perjury.  The facts here are quite different. The admonitions that were proffered on the record— which the Fourth Circuit apparently adopted as factually true—were not made in "unnecessarily strong terms" nor were they "lengthy and intimidating." Webb, 409 U.S. at 97-8, 93, S.Ct. 351. Unlike Webb, the proffered comments were "brief, factual, and explanatory; they were mildly worded; they were designed to allow [Ms. Hoover] an opportunity to make her own decision … rather than to impose a decision on her; and they conveyed neither an assumption that perjury

would occur nor a threat of prosecution for perjury." United States v. Jaeger, 538 F.3d 1227, 1232 (9th Cir. 2008).

In light of the foregoing, this Court finds no error. Clearly, a prosecutor does not have to idly stand by when it is believed that a witness is about to commit perjury. Although the judge or prosecutor may not threaten a witness with punishment for choosing to testify, the Constitution does not forbid a witness from being made aware that, *if* she testifies, she must do so truthfully and will face legal consequences for lying. A criminal defendant has no constitutional right to suborn perjury, and he suffers no due process violation simply because one of his witnesses is dissuaded from committing perjury after being informed in a nonthreatening manner of the legal consequences of such an action.

Finally, Rubens has not provided any support, whatsoever, for his allegations that the prosecution actually threatened or coerced Ms. Hoover. Thus, Petitioner has not demonstrated that the state court decision rejecting this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court rejects the claim.

2.   Failure by the State to Correct Perjured Testimony

Next, Rubens alleges that the "State's witnesses testified falsely[,] and when trial counsel tried to expose this false testimony through objections and/or cross-examination, the prosecutor would misstate well established federal law to get the trial judge to allow the false testimony into evidence."[31]   Specifically, Rubens alleges that Lynette Metts, Jess Salts, and Emily Shelton, perjured themselves when they testified: "(1) that the decedent did not use illegal narcotics

---

[31] Rec. Doc. No. 1, p. 9.

whatsoever, [] they knew nothing about any narcotics, and (2) that the death threats were only 'jokes'".[32]  Rubens also claims that Lynette Metts perjured herself when she gave inconsistent testimony about whether she told the NOPD or the District Attorney about the death threats made by the decedent.[33]  The Louisiana Fourth Circuit Court of Appeal denied Rubens' claim, explaining:

> In his seventh pro se assignment of error, defendant asserts that the trial court erred in permitting the State to knowingly introduce false and perjured testimony over defense objections.  Defendant points to testimony by Lynnette Metts, Jess Salts, and Emily Shelton as being false and perjurious.
>
> Defendant cites Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), holding that where a prosecutor allows a State witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness's testimony reasonably could have affected the jury's verdict, even if the testimony goes only to the credibility of the witness.  360 U.S. at 269, 79 S.Ct. at 1177; accord State v. Broadway, 96–2659, p. 17 (La.10/19/99), 753 So.2d 801, 814; State v. Williams, 338 So.2d 672, 677 (La.1976).  To prove a Napue claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony.  Broadway, 96–2659, p. 17, 753 So.2d at 814.  Furthermore, fundamental fairness, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269, 79 S.Ct. 1173.  When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial.  Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).  However, the grant of a new trial based upon a Napue violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. United States v. O'Keefe, 128 F.3d 885, 893 (5 Cir.1997).  The court in O'Keefe elaborated on the materiality element of the analysis, stating:
>
>> The Supreme Court has recently defined materiality in terms of a "reasonable probability" of a different outcome.  Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).  Such a reasonable probability results when nondisclosure places the case in a different light so as to undermine confidence in the verdict. Id. at 435, 115 S.Ct. at 1566.  The relevant inquiry examines the challenged evidence collectively, not on an item-by-item basis.  Id. at 436, 115 S.Ct. at 1566–67. "To say that an error did not contribute

---

[32] Id. at 73-4.
[33] Id. at 74.

>    to the verdict is, rather, to find that error unimportant in relation to
>    everything else the jury considered on the issue in question, as
>    revealed by the record." <u>Yates v. Evatt</u>, 500 U.S. 391, 403, 111 S.Ct.
>    1884, 1893, 114 L.Ed.2d 432 (1991).
>
> <u>O'Keefe</u>, 128 F.3d at 894.
>
> Defendant recites the substance of, and sometimes quotes, allegedly false testimony
> by Metts, Salts, and Shelton.  He does not point to a particular page in the trial
> transcript for any references to Metts's allegedly false testimony.  In Salts' case,
> defendant cites several pages in the trial transcript where allegedly false testimony
> is located, and a range of pages where Shelton's allegedly false testimony is located.
>
> However, nowhere in this assignment of error does defendant point to evidence
> establishing that any testimony by Metts, Salts, or Shelton was false, internally
> inconsistent, or inconsistent with testimony of other witnesses or with other
> evidence.
>
> Thus, defendant has failed to make the necessary threshold showing under <u>Napue</u>
> that any testimony or statements by Metts, Salts, or Shelton was false.  Accordingly,
> there is no merit to this claim of error.

<u>Rubens</u>, 83 So. 3d at 30.   Because the Fourth Circuit identified the correct legal standard, <u>Napue</u>,

this court must determine if its decision was objectively unreasonable pursuant to U.S.C. §

2254(d)(1).

    "It is established that a conviction obtained through use of false evidence, known to be

such by representatives of the State, must fall under the Fourteenth Amendment."  <u>Napue</u>, 360

U.S. at 269.  "The same result obtains when the state, although not soliciting false evidence, allows

it to go uncorrected when it appears."  <u>Id</u>.  "The principle that a state may not knowingly use false

evidence, including false testimony, to obtain a conviction, implicit in any concept of ordered

liberty, does not cease to apply merely because the false testimony goes only to the credibility of

the witness."  <u>Id</u>.

    A petitioner may only obtain habeas relief for a violation of <u>Napue</u> if: "(1) the statements

in question are shown to be actually false; (2) the prosecution knew that they were false; and (3)

the statements were material."  <u>O'Keefe</u>, 128 F.3d at 893 (5th Cir. 1997) (citing <u>United States v.</u>

Blackburn, 9 F.3d 353, 357 (5th Cir. 1993)).  In order to establish that alleged statements are false, a petitioner must demonstrate more than "a conflict in the testimony."  United States v. Wall, 389 F.3d 457, 473 (5th Cir. 2004); see also Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001) (citing Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990)).  An allegedly perjured statement is material "if its use creates a reasonable likelihood that the jury's verdict might have been different." United States v. Washington, 44 F.3d 1271, 1282 (5th Cir. 1995) (quoting United States v. Bermea, 30 F.3d 1539, 1565 (5th Cir. 1994)) (internal quotations omitted).

Rubens fails to satisfy the above enumerated factors and accordingly, his claim must be denied.  Specifically, Rubens fails to demonstrate that Lynette Metts', Jess Salts', and Emily Shelton's testimony constituted perjury.  Although Rubens points out alleged inconsistencies between the testimony of witnesses and their pre-trial statements[34], contradictory testimony from witnesses, inconsistencies within a witness' testimony, and conflict between reports, written statements and the trial testimony of witnesses do not constitute perjury.  Ruiz v. Cockrell, 2003 WL 22038350, *9, adopted by 2003 WL 22231294 (N.D. Tex 2003) citing Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990); Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001) ("Conflicting or inconsistent testimony is insufficient to establish perjury.").  For example, the fact that Rubens alleges that Lynette Metts gave inconsistent testimony about whether she told the New Orleans Police Department or the New Orleans District Attorney's Office about the alleged death threats the decedent made ("on the way out of the door of Metts' trailer to go confront Rubens") does not make those statements false.[35]  Rather, such testimony merely presents a credibility question for the jury.  Koch, 907 F.2d at 531; Tucker v. Day, 969 F.2d 155, 158–159 (5th Cir. 1992) citing Little v. Butler, 848 F.2d 73, 76 (5th Cir. 1988).

---

[34] Rec. Doc. No. 1, p. 73-4
[35] Id.

Moreover, aside from his bald, unsupported allegations, Rubens has not presented any competent evidence that Lynette Metts, Emily Shelton, and Jess Salts committed perjury when they allegedly testified that the decedent was not using illegal narcotics on the day Rubens shot him. To the contrary, all three witnesses testified that they were unaware if the decedent was taking any illegal narcotics, and Jess Salts and Emily Shelton admitted they knew the decedent had used marijuana and more serious drugs in the past.[36] Thus Rubens' contention that Lynette Metts, Jess Salts and Emily Shelton lied about the decedent's drug use is wholly unsupported and belied by their actual testimony.

Likewise, Rubens has failed to prove that the government directed or procured Lynette Metts', Emily Shelton's, or Jess Salts' allegedly perjured testimony. Indeed, contrary to trying to create the false image that Irwin was a non-drug user, the government disclosed to defense counsel that Lynette Metts may have been giving prescription narcotics to Robert Irwin to deliver to Diane Hoover before Jess Salts or Emily Shelton even testified. The relevant portion of the transcript from Diane Hoover's testimony reads:

Q: Who did he go to New Orleans with?

A: My son.

Q: Do you know why?

Mr. Bourque: Judge I have to object. I think we might have to go speak about this in chambers.

The Court: Okay.

Mr. Bourque: Judge, ah, what's gonna happen here if she continues to answer these questions, she is gonna be in the position where she incriminates herself, potentially exposes herself to some sort of liability in that regard.

…

---

[36] St. Rec. Vol. 3 of 8, (trial transcript p. 158); St. Rec. Vol. 4 of 8, (trial transcript p. 324, 393).

Mr. Bourque: I don't know the exact source of the information.  I don't know it to be a fact in any way, shape, or form, but apparently Ms. Metts – I don't know if it's accurate to say from time to time but at some point in time – gave Mr. Irwin her prescription medication under the understanding that Mr. Irwin would give that medication to Ms. Hoover, because, because Rubens, she says, was not allowing her access to her medication.

…

The Court: So just help the court out with understanding.  What does that have to do with the line of questioning he asked the lady if –

Mr. Bourque: That's where this is going.  And I know this to be even less certain than the previous remarks I just made, but there is some allegation that perhaps the trip that he's referring to – and, of course, Ms. Hoover is gonna know about this, and she's a cooperating witness with the defense – that perhaps that Saturday before the killing Mr. Irwin went and dropped off that medication for Ms. Hoover the day before the death.  So he was not able to get in the issue of the pills the proper way, as you excluded it, so now we're gonna go – he's thought about it and has another second stab at the same issue.

(R. Vol. 3 of 8, trial transcript 177-79).

 Accordingly, Rubens' mere conclusory and unsupported allegations that Metts, Shelton and Salts committed perjury by allegedly testifying that the Irwin was not using illegal drugs are insufficient to warrant *habeas* relief.  See <u>Koch</u>, 907 F.2d at 530 (5th Cir. 1990) quoting <u>United States v. Woods</u>, 870 F.2d 285, 288 n. 3 (5th Cir. 1989) ("Although *pro se* habeas petitions must be construed liberally, 'mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue.'"); <u>United States v. Pineda</u>, 988 F.2d 22, 23 (5th Cir. l993) (same); <u>Beazley v. Johnson</u>, 242 F.3d 248 (5th Cir. 2001) ("conclusory allegations are insufficient to raise a constitutional issue"); <u>Mayberry v. Davis</u>, 608 F.2d 1070, 1072 (5th Cir. 1979).  Thus, Rubens' claim should be denied.

### 3.   Denial of the Right to Cross-Examination

Rubens next argues that he was denied his right to cross-examination when the trial judge prevented his lawyer from questioning Lynette Metts "[whether] she had a prescription for Xanax and Lortabs and [whether] she [gave] the decedent any because it related to her credibility as a witness."[37]  The Louisiana Fourth Circuit Court of Appeal denied Rubens' claim, holding:

> Defendant complains of a State objection on relevance grounds when Metts was asked if she had prescriptions for Xanax and Lortab. The trial court ultimately sustained the objection, after much discussion in chambers. Defendant fails to show how the State objection was unwarranted. Therefore, there is no merit to his claim that he was denied his right to cross-examine Lynette Metts in this regard.

> Defendant also claims defense counsel was denied effective cross-examination of Metts as to whether she gave some of this prescription medication to Bobby Irwin to give to Diane Hoover. The State objected, and the trial court sustained the objection. Defendant fails to establish that the objection was unwarranted, or that the trial court's sustaining of the objection was an abuse of discretion.

Rubens, 83 So. 3d at 61.

The Sixth Amendment right to present a complete defense encompasses a defendant's rights under the Confrontation Clause to rebut the State's evidence through cross-examination.  See Webb, 409 U.S. at 93 S.Ct. 351; Washington v. Texas, 388 U.S 14, 87 S.Ct. 1920 (1967); Taylor v. Illinois, 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); see also Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142 (1986).  The main purpose of confrontation is to provide the defendant the opportunity of cross-examination, which is the principal means by which the believability of a witness and the truth of her testimony are tested.  Davis v. Alaska, 94 S.Ct. 1105 (1974); See Webb 409 U.S. at 93 S.Ct. 351; Washington, 388 U.S 14, 87 S.Ct. 1920; Taylor, 484 U.S. at 410, 108 S.Ct. at 98; see also Crane, 476 U.S. at 690, 106 S.Ct. 2142.  The right, however, is not unfettered or absolute.  See, Montana v. Egelhoff, 518 U.S. 37, 62, 116 S.Ct. 2013, 135

---

[37] Rec. Doc. No. 1, p. 75.

L.Ed.2d 361 (1996).  A trial judge has "'wide latitude to' exclude evidence that is 'repetitive ...,

only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the

issues.'"  Crane, 476 U.S. at 689–90 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106

S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

However, before granting relief based on a violation of the Confrontation Clause, the court

must apply harmless error analysis.  Fratta v. Quarterman, 536 F.3d 485, 507 (5th Cir. 2008). On

federal habeas review, the harmless error standard is governed by Brecht v. Abrahamson, 507 U.S.

619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which prohibits relief unless the constitutional

error had a "substantial and injurious effect or influence in determining the jury's verdict."  There

must be "more than a mere reasonable possibility that it contributed to the verdict."  Woods v.

Johnson, 75 F.3d 1017, 1026 (5th Cir. 1996) (citing Brecht 507 U.S. at 637).  The United States

Fifth Circuit Court of Appeal explained:

> On direct appeal, when faced with a constitutional violation, a court must reverse
> the judgment of the court below unless the constitutional error is 'harmless beyond
> a reasonable doubt.'  See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17
> L.Ed.2d 705 (1967).  However, in Brecht v. Abrahamson, 507 U.S. 619, 637, 113
> S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court articulated a 'less onerous'
> standard for assessing the impact of a state court's constitutional error on collateral
> review.   Under Brecht, a federal court may grant habeas relief on account of
> constitutional error only if it determines that the constitutional error had a
> 'substantial and injurious effect or influence in determining the jury's verdict.'  See
> id. at 623, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (quoting Kotteakos v.
> United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).  Under this
> standard, however, the petitioner should prevail whenever the record is 'so evenly
> balanced that a conscientious judge is in grave doubt as to the harmlessness of the
> error.'  O'Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947
> (1995).  As this court has explained, 'if our minds are "in virtual equipoise as to the
> harmlessness" under the Brecht standard, of the error, then we must conclude that
> it was harmful.'   Woods v. Johnson, 75 F.3d 1017, 1026–27 (5th Cir. 1996)
> (quoting O'Neal, 513 U.S. at 435, 115 S.Ct. 992, 130 L.Ed.2d 947)."  Robertson v.
> Cain, 324 F.3d 297, 304–05 (5th Cir. 2003).

Horn v. Quarterman, 508 F.3d 306, 322 n. 24 (5th Cir. 2007).

In this case it is clear that even if there was a confrontation violation it was harmless. The scope of the cross-examination which was disallowed was extremely narrow, with little or no relevance to the murder charge Rubens faced. The issue before the jury was whether it believed Rubens' story that Robert Irwin attacked him with a pencil and whether Rubens' use of deadly force was reasonable. As the Fourth Circuit noted, "Neither [Robert Irwin's] alleged history of lifelong drug abuse, which allegedly caused his divorce and cost him many jobs, nor the fact that at the time of his death he was allegedly a drug dealer, was relevant to defendant's self-defense claim."[38]

Furthermore, under the standard set forth in Brecht, it is clear that the excluded evidence did not have a "substantial and injurious effect or influence" on the verdict. The record shows—and the Fourth Circuit ruled—that Robert Irwin never used a pencil as a weapon, there was no sign of a fight and no evidence that the Robert Irwin was angry or upset when he went to talk to Rubens before the shooting. Thus, regardless of whether Rubens was allowed to cross examine Lynette Metts about whether she gave Robert Irwin Xanax or Lortabs the jury could have easily rejected Rubens' self-defense claim and returned a guilty verdict. Accordingly, the state court's decision denying relief on this issue was neither contrary to nor an unreasonable application of federal law. Rubens is not entitled to relief on this claim.

### 4.    Failure by the State to Turn Over Exculpatory Evidence

Next, Rubens claims that the State withheld exculpatory evidence. Specifically, Rubens contends that Det. Long and Sgt. Catalanotto deliberately omitted statements by Ms. Hoover and "the State's primary inculpatory witnesses" that the decedent was "'out of his mind on drugs' and

---

[38] Rubens, 83 So. 3d at 61.

about the true nature of those death threats as well as the decedent's deadly intentions when going

to attack the Petitioner."[39]  The Louisiana Fourth Circuit Court of Appeal denied Rubens' claim

because the "[d]efendant cites nothing in the record that establishes or even suggests that any of

the allegedly missing exculpatory/impeachment [statements] existed".[40]

The AEDPA places severe limitations on this Court's review of the state court's decision

rejecting petitioner's Brady claim.  The United States Fifth Circuit Court of Appeals has cautioned:

> Under AEDPA, [a federal court] do[es] not decide *de novo* whether a state prisoner
> has sufficiently proven a Brady violation.  See Yarborough v. Alvarado, 541 U.S.
> 652, 665, 124 S .Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under
> AEDPA by conducting our own independent inquiry into whether the state court
> was correct as a *de novo* matter."); Neal v. Puckett, 286 F.3d 230, 236 (5th Cir.
> 2002) (en banc) ("We have no authority to grant habeas corpus relief simply
> because we conclude, in our independent judgment, that a state supreme court's
> application of [federal law] is erroneous or incorrect.").  Rather, [a federal court]
> decide[s] whether the state court's Brady determination resulted in a decision that
> is contrary to, or involved an unreasonable application of, clearly established
> federal law.  Busby v. Dretke, 359 F.3d 708, 717 (5th Cir. 2004).

Dickson v. Quarterman, 462 F.3d 470, 477–78 (5th Cir. 2006).  For the following reasons, it is

evident that high bar has not been surmounted in the instant case.

The law regarding Brady claims is clear:

> A Brady violation occurs when the government fails to disclose evidence
> materially favorable to the accused.  This Court has held that the Brady duty extends
> to impeachment evidence as well as exculpatory evidence, and Brady suppression
> occurs when the government fails to turn over even evidence that is known only to police
> investigators and not to the prosecutor.  Such evidence is material if there is
> a reasonable probability that, had the evidence been disclosed to the defense, the
> result of the proceeding would have been different, although a showing of
> materiality does not require demonstration by a preponderance that disclosure of
> the suppressed evidence would have resulted ultimately in the defendant's acquittal.
> The reversal of a conviction is required upon a showing that the favorable evidence
> could reasonably be taken to put the whole case in such a different light as to
> undermine confidence in the verdict.

---

[39] Rec. Doc. No. 1, p. 63-4.
[40] Rubens, 83 So. 3d at 55.

Youngblood v. West Virginia, 547 U.S. 867, 869–70 (2006) (per curiam) (internal citations and quotation marks omitted). Therefore, to prevail on a Brady claim, the petitioner "must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment." DiLosa v. Cain, 279 F.3d 259, 262–63 (5th Cir. 2002).

In this case, Rubens offers nothing more than bald speculation that Det. Long and Sgt. Catalanotto deliberately suppressed statements by the State's "primary" witnesses. Habeas relief cannot be granted on such unsupported speculation. Where, as here, a petitioner presents no evidence, whatsoever, in support of a contention that Brady material was in fact withheld from the defense, his claim fails at the initial prong of the Brady inquiry. Williams v. Cain, Nos. 06–0224 and 06–0344, 2009 WL 1269282, at *5 (E.D.La. May 7, 2009); Watson v. Cain, Civ. Action No. 06–613, 2007 WL 1455978, at *7 (E.D.La. May 17, 2007); Abron v. Cain, Civ. Action No. 05–876, 2006 WL 2849773, at * 10 (E.D.La. Oct. 3, 2006); Harris v. United States, 9 F.Supp.2d 246, 275 (S.D.N.Y.1998) ("[T]he government does not bear the burden of establishing that documents were *not* withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him]."), *aff'd*, 216 F.3d 1072 (2nd Cir.2000); see also United States v. Avellino, 136 F.3d 249, 261 (2nd Cir.1998); Cruz v. Artuz, 97–CV–2508, 2002 WL 1359386, at * 14 (E.D.N.Y. June 24, 2002).   Thus Rubens' claim is without merit and should be denied.

5.   Erroneous Admission of Hearsay

Rubens' next claim is that his rights were violated when the trial court allowed the State to introduce inadmissible hearsay.  Rubens makes the broad claim that the judge improperly allowed testimony about conversations "between Diane Hoover and the decedent [for weeks] prior to the

shooting".[41]   Although Rubens neither specifies which witnesses gave the inadmissible hearsay, nor what the content of that hearsay was, this Court will surmise—through a liberal interpretation—that Rubens was referring to the two exhausted claims regarding the alleged hearsay testimony of Kendra Lee, Irwin's former wife, and Jess Salts regarding the relationship between Irwin and Hoover.[42]

The Louisiana Fourth Circuit Court of Appeal first denied Rubens' claim that Kendra Lee gave impermissible hearsay testimony, holding:

> Defendant first cites testimony by Kendra Lee, victim Bobby Irwin's former wife. The trial court sustained defense counsel's hearsay objection to the question as to whether, before his death, Bobby Irwin told Lee he had been seeing anyone. The trial court told the prosecutor he could ask the witness if she had knowledge. The prosecutor rephrased the question, but Lee started to answer by stating that Irwin had spoken to her, at which point defense counsel objected on hearsay grounds. The trial court effectively sustained the objection, instructing Lee that she could not testify to what someone had said to her. The matter was taken into chambers, and upon resuming direct examination of Lee, the prosecutor asked her if she knew who Bobby had been seeing at the time of his death. She replied in the affirmative, without objection by defense counsel. The prosecutor next asked the witness who the person was, and, again without any defense objection, Lee said the person was Diana Hoover. Defense counsel failed to object in any way to the subsequent questions and answers by Lee; thus, the trial court did not err in permitting the testimony.

Rubens, 83 So. 3d at 64.[43]   The court then went on to deny Rubens' claim that Jess Salts gave hearsay testimony about Irwin's relationship with Hoover because his statement that "Bobby

---

[41] Rec. Doc. No. 1, p. 15.

[42] Rubens, 83 So. 3d at 65; St. Rec. Vol. 6 of 8 (supplemental brief in support of direct appeal).

[43] Even if Rubens was able to show that admission of this testimony violated his right to due process, his claim appears to be procedurally barred because counsel failed to make a contemporaneous objection to the admission of the testimony.  See Wainright v. Sykes, 433 U.S. 72, 87–88 (1977) (holding that the contemporaneous objection rule is an independent and adequate state court ground to procedurally bar claims from *habeas corpus* review).  However, this Court need not address the issue of procedural default because Rubens' claim clearly fails on the merits, as discussed below.  Glover v. Hargett, 56 F.3d 682, 684 (5th Cir.1995); Wiley v. Puckett, 969 F.2d 86, 104 (5th Cir.1992); Corzo v. Murphy, Civ. Action No. 07–7409, 2008 WL 3347394, at * 1 n. 5 (E.D.La. July 30, 2008); Lee v. Cain, Civ. Action No. 06–9669, 2007 WL 2751210, at *9 (E.D.La. Sept. 18, 2007).

would go outside when he talked to Hoover and [that Salts] did not know whether Bobby had reached Hoover on his cell phone or not" was not, in fact, hearsay.[44]  For the reasons discussed below, Rubens' claim is without merit.

Evidentiary errors of state law are generally not cognizable in federal habeas review, unless the errors were so prejudicial as to result in a denial of a constitutionally fair proceeding. Jackson v. Johnson, 194 F.3d 641, 656 (5th Cir. 1999). Indeed, "the erroneous admission of prejudicial testimony does not justify habeas relief unless the evidence played a 'crucial, critical, and highly significant' role in the jury's determination." Id. Thus, in order for Rubens to obtain relief on his claim that the trial judge erroneously allowed the admission of hearsay under Louisiana law, he would have to prove that this testimony was so prejudicial that it denied him the right to a fair proceeding.

Not only has Rubens failed to make such a showing, he has not—and cannot—meet the preliminary burden that any statements about whether Diane Hoover was in a relationship with Robert Irwin were hearsay.  Under Louisiana law, hearsay is generally inadmissible at trial and is defined by La.Code Evid. art. 801(C) as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 802.  Here, any statements about the relationship between Diane Hoover and Robert Irwin are not hearsay because they were not offered for the truth of the matter asserted.  To the contrary, any statements about the relationship between Diane Hoover and Robert Irwin had at least two independent grounds for admission.  First, the statements could have been used to show Rubens' bias against Mr. Irwin for believing Mr. Irwin was having an affair with his

---

[44] Rubens, 83 So. 3d at 65.

girlfriend, and second, the statements would support a motive for Rubens to kill Mr. Irwin. Accordingly, Rubens has failed to show that these statements were in fact hearsay.

Furthermore, even if Rubens were able to prove the statements about the relationship between Diane Hoover and Robert Irwin were hearsay, his claim would nonetheless fail because it did not render the trial fundamentally unfair. A state court's evidentiary ruling violates the Due Process Clause if it renders the trial fundamentally unfair, which is to say only if it relates to evidence that is crucial, critical, and highly significant. Mullen v. Blackburn, 808 F.2d 1143, 1145 (5th Cir.1987). Here, Rubens' confession—"the most probative and damaging evidence that can be admitted against [a defendant]"—Arizona v. Fulminante, 499 U.S. 279, 294, 111 S. Ct. 1246, 1257, 113 L. Ed. 2d 302 (1991)—that he shot Robert Irwin (after Mr. Irwin attacked him with a pencil), rendered any statements about Diane Hoover's relationship with Robert Irwin, relatively insignificant at trial and therefore the admission of said statements does not rise to the level of a due process violation. Thus, Rubens' claim should be denied.

6. Compulsory Process

Rubens' penultimate claim is that he was "denied compulsory process and it was due to either ineffective assistance of counsel or the trial court."[45] Specifically, Rubens' claim is based on a subpoena *duces tecum* to AT&T for text messages from Diane Hoover's cell phone that allegedly contained death threats by Robert Irwin.[46] The trial court signed the subpoena on July 21, 2009 with a return date of August 7, 2009.[47] "At that August 7, 2009 hearing, the State withdrew certain audiotaped messages; other audiotapes were discussed; and the trial court

---

[45] Rec. Doc. No. 1, p. 14. Subsequent to this Court's initial report and recommendation, Rubens has withdrawn his claims of ineffective assistance of counsel. See Rec. Doc. No. 25.

[46] Id.

[47] Rubens, 83 So. 3d at 58.

reissued the subpoena *duces tecum* 'previously filed' by defendant, presumably referring to one directed to AT&T."[48]  The Louisiana Fourth Circuit Court of Appeal denied Rubens' claim, because there was no indication in the record that Rubens ever requested relief when AT&T failed to produce the text messages and thus the trial court did not infringe on his right to compulsory process.[49]

Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution (1974) guarantee a criminal defendant the right to compulsory process and to present a defense. A defendant's right to compulsory process is the right to demand subpoenas for witnesses and the right to have those subpoenas served.  Dutton v. Evans, 400 US 74, 27 L Ed 2d 213, 91 S Ct 210 (1970); Washington, 388 U.S. at 19.  While the Sixth Amendment guarantees a defendant the right to compulsory process, the right is not absolute.  United States v. Gonzales, 79 F.3d 413, 424 (5th Cir. 1996). "The Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor.*'" (emphasis in original) United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982) (quoting U.S. Const. amend. VI).

Rubens' claim is without merit because he has failed to show that the trial court did anything to exclude the text messages from AT&T.  To the contrary, the trial court granted Rubens' request for the records and even reissued the subpoena when AT&T failed to comply with the court's order.  Once the trial court reissued the subpoena, Rubens had the opportunity and onus to request relief, which he failed to do.  See Duff-Smith v. Collins, 973 F.2d 1175, 1182 (5th Cir. 1992) (denying a compulsory process claim when defense counsel had the opportunity to call witnesses at an evidentiary hearing but declined to do so).  Accordingly, Rubens abandoned any

---

[48] Id.
[49] Id.

claim that the trial court denied him his right to compulsory process when he failed to follow-up on his request for the AT&T records. Finally, this Court need not address Rubens' claim of ineffective assistance of counsel as he abandoned that claim in his motion to amend his *habeas* petition.[50] Accordingly this claim should be denied.

### 7. Prosecutorial misconduct

In his petition, Rubens makes claims that the prosecutor engaged in misconduct during both opening and closing statements. Specifically, Rubens claims: "The prosecutor made highly prejudicial, inflammatory, and untrue accusations in his opening [statement] to the jury and in closing argument as well as rebuttal. This was calculated to inflame the passions and prejudices of the jury and was done to secure petitioner's conviction."[51] Rubens then specifies two instances where the prosecutor engaged in misconduct: (1) "the prosecutor said on the record that this [use of force form] stated Petitioner had been 'dragged kicking and screaming from the attic and had to be tasered because he was resisting arrest.' The prosecutor would also scream and yell this balderdash at the jury in his opening and closing to the jury at trial" and (2) the prosecutor "personally vouched for [Jess] Salts' credibility [during closing argument]."[52] Mr. Rubens' claims are both procedurally barred and without merit.

First, Mr. Rubens' general claim that the prosecutor engaged in misconduct during opening statements is procedurally barred because it was denied by the Louisiana Fourth Circuit Court of Appeal on an independent and adequate state law ground. The court explained that Rubens'

---

[50] Rec. Doc. No. 25.
[51] Rec. Doc. No. 1, p. 11.
[52] Rec. Doc. No. 1, p. 55-7.

attorney failed to preserve all but one (unrelated) claim of prosecutorial misconduct during opening

statement:

> Defendant's first specific argument is that the State made an improper opening statement that was "so patently false, prejudicial, and inflammatory that it effectively served to bias the jury for the trial that followed."
>
> 'The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.' La. C.Cr.P. art. 766.
>
> [The court then went on to discuss, and deny, the one unrelated, preserved, claim that 'the prosecutor said Manning was going to call New Orleans Police Department Second District units and the 'entire neighborhood of people' who were involved with defendant who were like minded and go to Manning's home.']
>
> Defendant attacks other portions of the prosecutor's opening statement as well. However, as previously noted, defense counsel made only one objection during the State's opening statement, and that matter was resolved. *There were no objections to any of the matters of which defendant now complains. Therefore, those issues are not preserved for appellate review. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La.C.Cr.P. art. 841.*

Rubens, 83 So. 3d at 51-52 (emphasis added).    Second, Rubens' claims of prosecutorial

misconduct during closing argument are both unexhausted and without merit.  This Court will first

address the procedural bar to Mr. Rubens' claims of prosecutorial misconduct during opening

statement.

### i. Opening Statement — Procedural Default

Generally, a federal court will not review a question of federal law decided by a state court

if the decision of that state court rests on a state ground that is both independent of the federal

claim and adequate to support that judgment.  Maples v. Thomas, 132 S.Ct. 912, 922 (2012);

Walker v. Martin, 131 S.Ct. 1120, 1127 (2011); Coleman v. Thompson, 501 U.S. 722, 731–32

(1991); Roberts v. Thaler, 681 F.3d 597, 604 (5th Cir. 2012), cert. denied, 133 S.Ct. 529 (2012);

Glover v. Cain, 128 F.3d 900, 902 (5th Cir.1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir. 1995). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. Finley v. Johnson, 243 F.3d 215, 218 (5th Cir.2001); Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar. Harris v. Reed, 489 U.S. 255, 263 (1989); Roberts, 681 F.3d at 604; Finley, 243 F.3d at 218; Glover, 128 F.3d at 902.

The United States Fifth Circuit Court of Appeals has stressed that a federal habeas court must determine as a threshold matter whether procedural default has occurred on any asserted claim. Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997). This court has discretion to raise procedural default *sua sponte*, provided that the petitioner has notice that the issue is being considered. Amos v. Thornton, 646 F.3d 199, 203 n. 4 (5th Cir. 2011), *cert. denied,* 132 S.Ct. 773 (2011) (citing Prieto v. Quarterman, 456 F.3d 511, 518 (5th Cir. 2006); Fisher v. Texas, 169 F.3d 295, 301 (5th Cir.1999)); Magouirk v. Phillips, 144 F.3d 348, 358 (5th Cir. 1998). Although the State did not address the issue of procedural default in its response, this Court will address *sua sponte* the procedural default of Rubens' claim before determining whether the merits of the claim are properly before this court.

Accordingly, *petitioner is hereby specifically instructed that this report and recommendation is notice to him that this court is sua sponte raising the issue of procedural default and that petitioner must submit any evidence or argument concerning the default as part of any objections he may file to this report*. Prieto, 456 F.3d at 518; Magouirk, 144 F.3d at 359.

1.   <u>Independent and Adequate</u>

For the foregoing state-imposed procedural bars to prevent review by this federal habeas court, the bars must be independent and adequate.  A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar.  <u>Roberts</u>, 681 F.3d at 604; <u>Finley</u>, 243 F.3d at 218; <u>Amos</u>, 61 F.3d at 338.  To be "adequate," the state procedural rule must be strictly or regularly followed by the state courts and evenhandedly applied to the majority of similar claims.  <u>Roberts</u>, 681 F.3d at 604; <u>Finley</u>, 243 F.3d at 218; <u>Glover</u>, 128 F.3d at 902.

The Louisiana Fourth Circuit declined to review Rubens' claim based on La.Code. Crim P. art. 841.  Article 841 provides that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."  This contemporaneous objection rule, used to bar Rubens' claim that the prosecutor engaged in prosecutorial misconduct via improper remarks during opening and closing statements, is an independent and adequate state procedural rule.  <u>Duncan v. Cain</u>, 278 F.3d 537, 541 (5th Cir. 2002) (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87–88 (1977)), cert. denied, 537 U.S. 829 (2002); <u>Bowie v. Cain</u>, 33 Fed.Appx. 705, 2002 WL 432675, at *2 & n. 9 (5th Cir. 2002); <u>Rosales v. Cockrell</u>, 48 F. App'x 103 (5th Cir. 2002) ("Failure to preserve an issue for appeal constitutes an independent and adequate state ground upon which to base a procedural bar to federal review"); see <u>Thompson v. Quarterman</u>, 292 F. App'x 277, 290 (5th Cir. 2008); <u>Foster v. Johnson</u>, 293 F.3d 766 (5th Cir. 2002) ("State high court's denial on direct appeal of capital murder defendant's Eighth Amendment attack on his death sentence, on ground that claim was not preserved due to failure to raise it at trial, was independent and adequate state ground precluding review of same claim on petition for federal habeas relief; state court clearly stated that preservation rule was one of two alternative grounds for denial of claim,

establishing independence, and rule was firmly established and regularly applied in state's cases"). Louisiana courts have concluded that "[a] defendant is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection may not be raised for the first time on appeal." State v. Browning, 956 So.2d 956, 972 (5th Cir. 2007); State v. Young, 764 So.2d 998, 1005 (La. App. 1st Cir. 2000).

The state courts' ruling, therefore, was based on Louisiana law setting forth the procedural requirements for preservation and presentation of claims for appellate review.  See Fisher, 169 F.3d at 300 (state courts' clear reliance on state procedural rule is determinative of the issue).  The state court's reason for dismissal of this claim was therefore independent of federal law and adequate to bar review of this claim in this court.

## 2.  Cause and Prejudice

A federal habeas petitioner may be excepted from the procedural default rule only if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." Fisher, 169 F.3d at 301 (citing Coleman, 501 U.S. at 748–50); Amos, 61 F.3d at 338–39 (citing Harris, 489 U.S. at 262; Engle v. Isaac, 456 U.S. 107, 129 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. Murray v. Carrier, 477 U.S. 478, 488 (1986).  The mere fact that petitioner or his counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default. Id. at 486.

In this case, Rubens has not offered any cause for the default which would excuse the procedural bar imposed by the Louisiana courts.  This Court's review of the record does not

support a finding that any factor external to the defense prevented Rubens from preserving this claim for appeal and raising it in a procedurally proper manner.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." Hogue v. Johnson, 131 F.3d 466, 497 (5th Cir. 1997) (citing Engle, 456 U.S. at 134 n.43). Having failed to show an objective cause for his default, the court need not determine whether prejudice existed, and petitioner has not alleged any actual prejudice. Ratcliff v. Estelle, 597 F.2d 474 (5th Cir. 1979) (citing Lumpkin v. Ricketts, 551 F.2d 680, 681–82 (5th Cir. 1977)).

### 3.   Fundamental Miscarriage of Justice

A petitioner may avoid procedural bar only if a fundamental miscarriage of justice will occur if the merits of his claim are not reviewed. Hogue, 131 F.3d at 497 (citing Sawyer v. Whitley, 505 U.S. 333, 339 (1992)). To establish a fundamental miscarriage of justice, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence." Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986); accord Murray, 477 U.S. at 496; Glover, 128 F.3d at 902. To satisfy the factual innocence standard, petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. Campos v. Johnson, 958 F.Supp. 1180, 1195 (W.D.Tex.1997) (footnote omitted); see Nobles, 127 F.3d at 423 n.33 (actual innocence factor requires a showing by clear and convincing evidence that, "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."). When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception. Glover, 128 F.3d at 903.

Rubens presents no clear and convincing evidence that suggests his actual innocence on the underlying conviction. For these reasons, he has failed to overcome the procedural bar, and this basis for his prosecutorial misconduct claim should be dismissed with prejudice as procedurally barred.

### ii. Closing Argument — Lack of Merit

Rubens also makes the same two claims of prosecutorial misconduct, i.e., that the State vouched for the credibility of Jess Salts and impermissibly told the jury that he had to be dragged kicking and screaming from the house during closing argument.  Although both claims are unexhausted because Rubens failed to present them to the state courts, this Court will nevertheless exercise its power to deny the claims on the merits, as it can with unexhausted § 2254 petitions in accordance with 28 U.S.C. § 2254(b) (2).[53]

A prosecutor's comment does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the trial was rendered fundamentally unfair in violation of the Due Process Clause.  Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988).  "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citations and quotations omitted); accord Rogers v. Lynaugh, 848 F.2d 606, 608 (5th Cir. 1988); Bell v. Lynaugh, 828 F.2d 1085, 1095 (5th Cir. 1987).  The prosecutor's remarks must be evaluated in the context of the entire trial. Greer v. Miller, 483 U.S. 756, 765–66 (1987) (citing Darden, 477 U.S. at 179); Kirkpatrick v. Blackburn, 777 F.2d 272, 281 (5th Cir. 1985).

---

[53] See St. Rec. Vol. 6 of 8, (supplemental brief of appellant).

District courts in the Fifth Circuit must apply a two-step analysis when reviewing claims of prosecutorial misconduct.  United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000); United States v. Lankford, 196 F.3d 563, 574 (5th Cir. 1999).  First, the court must determine whether the prosecutor made an improper remark.  Wise, 221 F.3d at 152.  "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant."  Id.  A habeas corpus petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks."  Jones, 864 F.2d at 356; accord Hogue v. Scott, 874 F.Supp. 1486, 1533 (N.D.Tex.1994).  Under this test, a petitioner must demonstrate that the comment rendered his trial "fundamentally unfair," by showing "a reasonable probability that the verdict might have been different had the trial been properly conducted."  Rogers, 848 F.2d at 609 (footnote and citations omitted).  "In attempting to establish that a prosecutor's improper comments constitute reversible error, the criminal defendant bears a substantial burden."  United States v. Virgen-Moreno, 265 F.3d 276, 290 (5th Cir. 2001) (citing United States v. Diaz-Carreon, 915 F.2d 951, 956 (5th Cir. 1990)).  When determining the effect of the prosecutors' impermissible comments, this Court considers three factors: "the magnitude of the prejudicial effect of the remark, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt."  United States v. Bermea, 30 F.3d 1539, 1563 (5th Cir. 1994), cert. denied, 513 U.S. 1156, 115 S.Ct. 1113, 130 L.Ed.2d 1077 (1995); United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994).

This Court will address the issue of vouching first.  Because Rubens does not specify where the prosecutor vouched for Jess Salts' credibility, this Court located all of the State's references to Jess Salts during closing argument:

41

Why would they risk perjury, Jess Salts, why would he do that?  Ask yourselves in the jury box, why fact witnesses, the people that were there, have any reason to lie?  None.  Their friend is dead.  Whether he was the victim of a justifiable homicide or the victim of an unjustifiable homicide, I doubt it's going to play into their decision to commit perjury, risk jail time, or tell the truth, consistently, the whole lot of them.

…

Or about Jess Salts.  This is – the things that [Mr. Hessler] wants you to think are important when you take back to the jury room to deliberate.  The fact that Jess Salts says that he doesn't think [Robert Irwin] went into the mobile home.  And he thinks he just opened the door and put the stuff in, or Emily Shelton did go into the motor home.  Why does that matter?  Why does that matter?

…

He goes downstairs what does he tell Jess?  Jess is still concerned.  "Is everything okay?  We're worried about this.  We're worried about you."  He says, "No, everything's fine."  That's cool.  Gives him his keys.  Jess goes over to the motor home, whether it gets fully in or it does not [sic].  Tells Emily he's going to bring back the keys, and hears the shots.

…

Mr. Hessler says that the reason Rubens fled the scene was because of Jess Salts.  Again, it comes back to Jess Salts. a bare chested Jess Salts standing out there, freaking out about his friend, not knowing what's going on.  By no means there to fight, his wife, girlfriend, and their two young children half naked in their car, that guy wasn't fighting anybody.  But that's his excuse for running off.

St. Rec. Vol. 3 of 8. (trial transcript closing argument)

The court has carefully reviewed all the references that the State made to Jess Salts during closing argument.  In none of the instances did the prosecutor suggest that the State had additional knowledge or information about the case which had not been disclosed to the jury.  See, e.g., United States v. Munoz, 150 F.3d 401, 414 (5th Cir. 1998); Nichols v. Scott, 69 F.3d 1255, 1282–83 (5th Cir.1995) (comments are not improper where it is apparent to the jury that the comments are based on the evidence presented at trial rather than on personal knowledge of

facts outside the record); <u>Richthofen</u>, 2008 WL 630477, at *49 n. 81; <u>Spicer</u>, 2007 WL 4532221, at *9.  As required by Louisiana Code of Criminal Procedure article 774, the prosecutor's various arguments quoted were "confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state ... may draw therefrom, and to the law applicable to the case."  Thus Rubens has failed to meet the threshold showing that there was prosecutorial vouching at all.

Next, Rubens claims that the prosecutor improperly remarked that Rubens was 'dragged kicking and screaming from the attic and had to be tasered because he was resisting arrest.' Rubens' apparent objection to this comment is that there was no evidence to support the fact he was dragged kicking and screaming from the apartment.  When defense counsel made this objection during closing argument, the prosecutor amended his comment to "they had to tase him to get him out of the attic.  Enough said."  St. Rec. Vol. 3 of 8 (trial transcript p. 7).  Thus Rubens cannot show that the remark was persistent or pronounced enough to amount to a due process violation.  Furthermore, Rubens cannot prove that had this relatively insignificant comment been excluded, compared with the substantial evidence at trial, there would have been a 'reasonable probability that the verdict might have been different.'  Accordingly, this claim is both unexhausted and without merit.

## RECOMMENDATION

For the foregoing reasons, **IT IS RECOMMENDED** that Rubens' petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).

New Orleans, Louisiana, this __30th__ day of September, 2016.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**